```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3   _____

     UNITED STATES OF AMERICA,
 4
                         Plaintiff,        Criminal Action
 5                                         No. 08-mj-00423-RBC
     V.
 6                                         August 20, 2008
     MICHELLE ROBINSON,
 7
                         Defendant.
 8   _____

 9

10

11               TRANSCRIPT OF DETENTION HEARING

12          BEFORE MAGISTRATE JUDGE ROBERT B. COLLINGS

13               UNITED STATES DISTRICT COURT

14            JOHN J. MOAKLEY U.S. COURTHOUSE

15                    1 COURTHOUSE WAY

16                  BOSTON, MA  02210

17

18

19
     Court Reporter:
20   Proceedings recorded by electronic sound recording, transcript
     Produced by transcription service.
21

22

23               DEBRA M. JOYCE, RMR, CRR, FCRR
                     Official Court Reporter
24               John J. Moakley U.S. Courthouse
                   1 Courthouse Way, Room 5204
25                     Boston, MA  02210
                      joycedebra@gmail.com
```

1    APPEARANCES:

2    FOR THE GOVERNMENT:

3    MARK D. SMITH, ESQ.
     Laredo & Smith, LLP
4    101 Federal Street, Suite 650
     Boston, MA 02110
5    617-443-1100

6    FOR THE DEFENDANT:

7    JAMES P. DOWDEN, ESQ.
     Ropes and Gray
8    800 Boylston Street
     Prudential Tower
9    Boston, MA 02219
     617-748-3334

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(The following proceedings were held in open court before Magistrate Judge Robert B. Collings, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on August 20, 2008.

The defendant, Michelle Robinson, is present with counsel.  The Assistant U.S. Attorney is present.)

THE CLERK:  The case of United States v. Michelle Robinson, criminal action 08-mj-00423 will now be heard before this Court.

Counsel please identify themselves for the record.

MR. DOWDEN:  Good afternoon, your Honor.  James Dowden on behalf of the United States.

THE COURT:  Good afternoon.

MR. SMITH:  Good afternoon, your Honor.  Mark Smith for Michelle Robinson.

THE COURT:  Okay.  The case is here for a preliminary hearing and detention hearing.

Is the government ready to go forward?

MR. DOWDEN:  Yes, your Honor, the government is.

THE COURT:  Mr. Smith, are you ready to go forward?

MR. SMITH:  Yes, your Honor.

THE COURT:  Go ahead.

MR. DOWDEN:  Your Honor, the government calls Special

| | |
|---|---|
| 1 | Agent Nancy McCormick. |
| 2 | THE COURT:  Will you come forward, ma'am, stand in the |
| 3 | witness box, and raise your right hand? |
| 4 | NANCY McCORMICK, having been duly sworn by the Clerk, |
| 5 | was examined and testified as follows: |
| 6 | THE COURT:  Please be seated, ma'am.  And I'd ask you |
| 7 | to speak right into that microphone.  Keep the microphone about |
| 8 | an inch from your mouth, please. |
| 9 | MR. DOWDEN:  Your Honor, may I proceed? |

11:11  10    THE COURT:  Yes, you may, Mr. Dowden.

11                   DIRECT EXAMINATION

12 BY MR. DOWDEN:

13 Q.   Special Agent McCormick, can you please spell your name

14 for the record?

15 A.   Nancy McCormick, M-c-C-o-r-m-i-c-k.

16 Q.   Special Agent McCormick, where are you currently employed?

17 A.   I work for the FBI here in Boston, Massachusetts.

18 Q.   What unit are you assigned to?

19 A.   The White-Collar Crime Economics Crime Unit.

11:12  20 Q.   For how long have you been in your current position?

21 A.   For 18 years, a little over 18 years.

22 Q.   During the course of your duties, were you assigned to an

23 investigation related to the defendant, Michelle Robinson?

24 A.   Yes, I was.

25 Q.   In general terms what, is the nature of this

1    investigation?

2    A.    It's an extortion with threats dealing with the nature of

3    her relationship with the victim in the case.

4    Q.    Please just in very general terms describe the victim in

5    this case and the relationship of the defendant.

6    A.    The victim is a local very prominent businessman who paid

7    to have sex with the defendant.

8    Q.    And during the course -- the investigation relates to

9    threats?

11:14 10    A.    Threats to expose to the media, to the public the nature

11    of that relationship.

12    Q.    In the course of your investigation, did you prepare an

13    affidavit in support of a criminal complaint?

14    A.    Yes, I did.

15    Q.    And what was the charge that you sought the criminal

16    complaint for?

17    A.    The charges have to do with using interstate

18    communications to threaten, harm or exposure for money -- to

19    not do that for money.

11:15 20           MR. DOWDEN:  Your Honor, may I approach the witness?

21           THE COURT:  Yes, you may.

22    BY MR. DOWDEN:

23    Q.    Special Agent McCormick, I show you what's been marked as

24    Government Exhibit 1.  I ask you to take a moment to look at

25    that document.

1          Have you had an opportunity to look at that document?

2    A.   Yes.

3    Q.   What is that document?

4    A.   It's the affidavit for the criminal complaint.

5    Q.   Did you author that document?

6    A.   Yes, I did.

7    Q.   Is that document a fair and accurate reflection of your

8    investigation as of the day it was filed?

9    A.   Yes.

11:16 10          MR. DOWDEN:  Your Honor, at this point if the Court

11   would prefer to offer this into evidence and mark as Exhibit 1.

12          THE COURT:  I'll take it as being the testimony she

13   would give on direct examination if asked, and Mr. Smith can

14   cross-examine as to any matter in there.  It doesn't have to be

15   an exhibit because the affidavit is already in the record of

16   the court.

17          MR. DOWDEN:  Thank you, your Honor.

18   BY MR. DOWDEN:

19   Q.   Since you filed the affidavit with the Court, did you come

11:16 20   across any additional information in the course of your

21   investigation that would add or supplement that affidavit?

22   A.   It would be three things.

23          The first is in the affidavit, the time I listed --

24   the start of the relationship is listed as December 2007.  I

25   subsequently learned that a more accurate time frame would be

1    January or February of 2007.

2    Q.   And the affidavit says what with respect to the date of

3    the relationship --

4    A.   No later than December of 2007.

5    Q.   And you've gotten more accurate information since then.

6    A.   Yes.

7    Q.   You said there were two additional points.  What were

8    those?

9    A.   Another is that after the victim gave her $80,000, there

11:17 10   was a communication that took place.  My affidavit states that

11    that was a phone call.

12         THE COURT:  Could we have the paragraph you're

13    referring to, please?

14         THE WITNESS:  Paragraph 10.

15         THE COURT:  Okay.

16    A.   But the victim said that it may have been a text message

17    as the initial communication followed by a telephone call.

18    Q.   And the third additional information, again, with respect

19    if you can state what paragraph number it is in the complaint.

11:18 20   A.   It would be paragraph 12.  The affidavit states that

21    Robinson was driving a Land Rover at the time that she met with

22    the victim, and --

23    Q.   What meeting was that?

24    A.   This was a meeting on July 24, 2008.

25    Q.   And what happened during that meeting?

A.   During that meeting the victim gave Robinson $200,000 in
cash.

Q.   What's the inaccuracy?

A.   The victim stated that he met her in a Land Rover but
whether it was a Land Rover at this meeting or a different
meeting, there were two vehicles that he recalls her driving.

Q.   Have you -- during the course of your investigation did
you interview anyone else who was present during the second
meeting?

A.   I did.

Q.   And who was that?

A.   It was the victim's financial adviser who was present and
stated that he saw the defendant in that vehicle in the Land
Rover.

Q.   During the course of your investigation --

     THE COURT:   Let me understand.  You're saying the
victim can't remember whether it was a Land Rover or not at
this meeting, but the financial adviser was there and does
remember it to be a Land Rover; is that your testimony?

     THE WITNESS:   Yes.

BY MR. DOWDEN:

Q.   Just to clarify what the victim remembers with respect to
the car in terms of two meetings.

A.   The victim recalls that there was a BMW and there was a
Land Rover.  And he thought the Land Rover was at the first

1    meeting which took place at the Marriott and that the BMW was

2    at this meeting with which took place at Costco.

3    Q.   During the course of your investigation, did the victim in

4    this case participate in any consensually monitored telephone

5    calls?

6    A.   Yes, he did.

7    Q.   When were those calls placed?

8    A.   He attempted to make several calls, but the two recorded

9    conversations took place on August 8th and August 11, 2008.

11:22  10   Q.   Have you subsequently had an opportunity to listen to the

11   FBI recordings of those telephone calls?

12   A.   Yes.

13           MR. DOWDEN:  Your Honor, may I approach the witness?

14           THE COURT:  Yes.

15   BY MR. DOWDEN:

16   Q.   Special Agent McCormick, I show you what's been marked for

17   identification as Government Exhibit 2.

18           What is Government Exhibit 2?

19   A.   It is a copy of a CD of the conversation which took place

11:22  20   on August 11, 2008, approximately 6:20 p.m.

21           MR. DOWDEN:  Your Honor, I offer Government's Exhibit

22   2 into evidence.

23           THE COURT:  Any objection?

24           MR. SMITH:  No, your Honor.

25           THE COURT:  Okay.  This is the August 11th that's

1   referenced in paragraph 19 of your affidavit; is that correct?

2            THE WITNESS:  That's correct.

3            (Exhibit 2 received into evidence.)

4            MR. DOWDEN:  May I approach with this?

5            THE COURT:  Yes.

6   BY MR. DOWDEN:

7   Q.   Special Agent McCormick, I show you what's been marked for

8   identification as Government Exhibit 3.  Are you familiar with

9   that?

11:23 10   A.   Yes, this is also a copy of a telephone conversation which

11   was recorded which occurred on August 8, 2008.

12            MR. DOWDEN:  Your Honor, the government would offer

13   Exhibit 3.

14            THE COURT:  Any objection?

15            MR. SMITH:  No, your Honor.

16            THE COURT:  Is that one of the phone calls that's

17   referenced in paragraph 18 in your affidavit?

18            THE WITNESS:  Yes, it is.

19            (Exhibit 3 received into evidence.)

11:23 20            MR. DOWDEN:  Your Honor, at this time the government

21   would like to play Government Exhibits 2 and 3.

22            THE COURT:  All right.

23            MR. DOWDEN:  If we could go to Exhibit 3, which is the

24   telephone conversation of August 8, 2008.

25            THE COURT:  You're going to start with August 8, all

```
 1    right, go ahead.

 2                 (Played recording.)

 3                 MR. DOWDEN:  Your Honor, this next tape is from the

 4    8th of August, that's Government Exhibit 2.

 5                 THE COURT:  I thought it was the 11th?

 6                 MR. DOWDEN:  Excuse me, this one is from the 11th.

 7                 THE COURT:  All right, you may play it.

 8                 (Discussion off the record.)

 9                 (Played recording.)

11:43 10            MR. DOWDEN:  Your Honor, may I proceed?

11                 THE COURT:  Yes, please.

12    BY MR. DOWDEN:

13    Q.    Subsequent to these telephone conferences, Special Agent

14    McCormick, did you participate in the arrest of the defendant?

15    A.    I did.

16    Q.    When did that occur?

17    A.    That occurred on Wednesday, August 13th at the Costco

18    parking lot in Dedham.

19    Q.    Can you generally explain the circumstances surrounding

11:44 20    the arrest?

21    A.    We were aware of the location and we were set up in the

22    area of the Costco parking lot.

23    Q.    What was the purpose of the meeting in the Costco parking

24    lot?

25    A.    The purpose was for the victim to give the defendant what
```

1  was purported to be $300,000 in cash.  We had people in the lot

2  videotape the meeting between the victim and defendant, and I

3  observed the defendant drive into the parking lot in his silver

4  Range Rover, and subsequent to receiving the bag from the

5  victim --

6  Q.   You refer to a bag, what do you mean by bag?

7  A.   A bag that was allegedly containing the cash.  And the

8  victim is clearly seen, the defendant was arrested.

9  Q.   During the course of the arrest, the did the FBI seize any

11:45 10  items from the defendant?

11  A.   Yes, keys to the Range Rover were seized and the

12  defendant's purse, the contents of the purse were also seized.

13  Q.   Did you examine the contents of the purse that were

14  received?

15  A.   Yes, I did.

16  Q.   And what did you find?

17  A.   There was a safety deposit -- safe deposit box key.

18  Q.   Did you take any investigative efforts with respect to

19  that safe deposit key?

11:46 20  A.   I contacted the bank, and we also spoke with some of the

21  bank security about the account which was in the name of

22  Michelle Garcia.  We were advised that Michelle Garcia was the

23  sole signer, had sole access to that account.

24  Q.   Was that, in fact, a safe deposit box that did exist?

25  A.   Yes, they confirmed the existence of the box.

```
     1    Q.    And where was that safe deposit box located?

     2    A.    In a Bank of America, Washington Street, I believe, in

     3    Canton.

     4    Q.    And the person who was the signer for that account was

     5    again, whom?

     6    A.    Michelle Garcia.

     7    Q.    What other items did you find in the purse?

     8    A.    Two driver licenses in the name of Michelle Robinson, one

     9    of them was expired.

11:47 10   Q.    Did you take any other investigative steps with respect to

    11    RMV records in this case?

    12    A.    The Registry of Motor Vehicle --

    13    Q.    Yes.

    14    A.    I did.

    15    Q.    And with respect to those records, did you uncover any

    16    addresses for the defendant?

    17    A.    Connected to the person's record is a history of all the

    18    addresses that they've used with that license.  Under that

    19    license is listed 341 Bolivar Street Number N in Canton.  And

11:48 20   there were previous addresses, including the one that she told

    21    us was her address, 53 Third Street in Jamaica Plain.  There

    22    was also a Stoughton address and a few others.

    23    Q.    What other items did you find in the purse?

    24    A.    Cash, a stack of dollar bills that were in a band, just

    25    under $7,000, plus additional money in her wallet; two debit
```

1    cards in the name of Michelle Robinson and one in the name of

2    Michelle Garcia; two Limited Too gift cards totaling just over

3    $500.

4             THE COURT:  I'm sorry, what?

5             THE WITNESS:  Limited Too, name of a store.

6             THE COURT:  Oh.

7    A.   Passport receipts.

8    Q.   Did you say "passport receipts"?  Can you explain what

9    those were?

11:50 10    A.   Each of them had a name printed on it in red.  One said

11   "Michelle" and the other said "Heaven," and they were expedited

12   requests for passports.  And the applications were made on

13   August 8, 2008 according to the receipt.

14   Q.   Among other items, what did you find?

15   A.   There's the Social Security cards, various makeup, and

16   things of that nature.

17   Q.   Any foreign currency?

18   A.   There was a single dollar from the Bahamas.

19   Q.   Any other information reflective of the intent to travel?

11:51 20    A.   There was also a business card in her wallet from a travel

21   agency, Mel Travel (phon.) handwritten notation on the back

22   that said, reference, picking up tickets by August 20th.

23   Q.   Did you take any further investigative steps with respect

24   to that business card?

25   A.   Yes.  I contacted the travel agency and interviewed the

1   travel agent, who told me that she had booked a trip for

2   Michelle Robinson and a male named Christian Lewis.  They both

3   had come in together to the travel agency on three different

4   occasions debating what type of trip to take; that Michelle

5   originally used the name Garcia but asked it to be changed to

6   Robinson because that was the name that appeared on her

7   passport; and had booked a trip for the two of them and

8   Michelle's two children to go to Disney and to the Bahamas.

9   Q.   And how did they pay for that trip?

11:52 10   A.   Lewis, the gentleman that was with the defendant, paid

11   with $100 bills that he took out of his pocket.

12   Q.   Approximately how much was this travel cost?

13   A.   There are actually two costs, the cost of the land portion

14   was about $2,700, and the cost of the air was, I believe,

15   around $1,700.

16   Q.   Paid in cash?

17   A.   Paid in cash.

18   Q.   Did you learn whether that trip was still planned?

19   A.   I learned that this past Saturday Mr. Lewis called to

11:53 20   cancel the trip.

21   Q.   During the course of your investigation, have you learned

22   any other names by which Ms. Robinson has gone by?

23   A.   The defendant told me -- I'm sorry, the victim told me

24   that she used the name Victoria Gonzales.  I've seen the name

25   Michelle Garcia in her purse.  And also on criminal history,

other names on the criminal history were Michelle Robinson,

Michelle Wilkinson, Shanae Wilkerson, and I believe that was

it.

Q.   You mentioned you reviewed her criminal record.  Have you

uncovered whether there are any prior defaults in connection

with any court appearances?

A.   There appear to be three prior defaults, one is connected

to a --

        MR. SMITH:  I'm going to object, your Honor.  I think

she's asking her to render a legal conclusion.  I think the

Pretrial Service people have already responded to that.

        THE COURT:  It's not a legal conclusion.  The

examination of records will tell you whether there's been a

default or not.

        In any event, you may cross-examine on the question,

so I'll overrule the objection.

        Go ahead.

A.   One appears to be a 1999 warrant out of Boston that

ultimately was dismissed.

Q.   The warrant was recalled?

A.   The warrant was recalled, yes.  One was out of Brockton

District Court having to do with police property.  The

defendant was arrested by Arlington PD on that warrant, and the

warrant was also recalled.

Q.   How about the underlying charges?

1    A.    The charges were dismissed.

2    Q.    And the third one you mentioned?

3    A.    And the third one has to do with a suspended or revoked

4    license out of Boston, and that was outstanding.

5    Q.    There's an ongoing default warrant in that case?

6    A.    Yes.

7          MR. DOWDEN:  Your Honor, at this point the government

8    has no further questions for this witness.

9          THE COURT:  Just a couple of questions.

11:55 10       You said there were a number of Social Security cards

11   in her purse or one?

12         THE WITNESS:  There were three Social Security cards,

13   two in her name and one in the name of another individual,

14   possibly a child.

15         THE COURT:  And were the two Social Security cards in

16   her name the same number?

17         THE WITNESS:  Yes.

18         THE COURT:  Thank you.

19         Mr. Smith, you may cross-examine.

11:56 20       MR. SMITH:  Thank you.

21                        CROSS-EXAMINATION

22   BY MR. SMITH:

23   Q.   Agent McCormick, you've been in the economic crimes

24   division for over ten years.  This is maybe a different kind of

25   case than traditional investigative economic crimes, would you

|  |  |
|---|---|
| 1 | agree with me on that? |
| 2 | A.   Yes, I would. |
| 3 | Q.   This involves escort services.  And have you ever |
| 4 | investigated escort services before in your work with the FBI? |
| 5 | A.   No, I have not. |
| 6 | Q.   And oftentimes escort services are referred to as |
| 7 | prostitution rings, or similar words; is that correct? |
| 8 | A.   Prostitution ring, yes. |
| 9 | Q.   Now, you met with the victim for the first time when in |
| 11:57 10 | this case? |
| 11 | A.   I believe August 7th. |
| 12 | Q.   And you met with him at a firm in Boston, or did he come |
| 13 | to the U.S. Attorney's Office? |
| 14 | A.   I met with him at a law firm. |
| 15 | Q.   And Mr. Dowden, the prosecutor, was there? |
| 16 | A.   Yes. |
| 17 | Q.   And this victim, this alleged victim's lawyer was also |
| 18 | present for that meeting; is that correct? |
| 19 | A.   The victim's lawyer was present, yes, he was. |
| 11:57 20 | Q.   Okay.  This is a big law firm.  And he's a successful, |
| 21 | prominent businessman; is that correct? |
| 22 | A.   Correct. |
| 23 | Q.   Sophisticated? |
| 24 | A.   I don't know. |
| 25 | Q.   He has real estate holdings across the country; isn't that |

```
 1    fair to say?

 2    A.   I don't know if there are real estate holdings.  I know he

 3    has business interests.

 4    Q.   Business interests in the United States, business

 5    interests in Israel, he funds start-ups.  This is not a person

 6    that owns one company and is successful in New England --

 7         THE COURT:  Well, how many questions are you putting

 8    to her at one time?  Please, let's --

 9         MR. SMITH:  I'm trying to hurry this along.

11:59 10       THE COURT:  That's all right, take your time.  I'm not

11    in a hurry.  Ask your questions, ask them in the proper form

12    without piling them up before the witness has a chance to

13    answer.

14         MR. SMITH:  Happy to do that, your Honor.

15    BY MR. SMITH:

16    Q.   He has more than one business?

17    A.   I don't know if he is the owner.  He has interests in more

18    than one business.

19    Q.   In more than one country?

11:59 20  A.   Yes.

21    Q.   And bank accounts in more than one country?

22    A.   No, American.

23    Q.   You spoke to his financial adviser?

24    A.   Correct.

25    Q.   He has various bank accounts spread across the country;
```

```
 1   fair to say?

 2   A.   (Inaudible.)

 3   Q.   And he told you that, at your first meeting, he met the

 4   defendant when?

 5   A.   About a year and a half ago.

 6   Q.   He told you that on August 7th of 2008?

 7   A.   Correct.

 8   Q.   And you wrote a report on or about that time?

 9   A.   Correct.

10   Q.   Has that report been amended since you wrote it?

11   A.   No.

12   Q.   So you met him on August 7th.  He said he met the

13   defendant through an escort service.  Now, he is an elderly

14   gentleman -- how old is he?

15   A.   I'm not sure of the exact age, but I would say he's in his

16   60s, late 60s.

17   Q.   And he's saying he, for whatever reason, decided to

18   utilize the services of an escort service; is that correct?

19   A.   He didn't give a reason, but he did say he decided to do

20   it.

21   Q.   Did he say that this was -- this time period -- whenever

22   he began this service, was it the first time he had used escort

23   services?

24        MR. DOWDEN:  Objection, your Honor.

25        THE COURT:  I sustain the objection.  I don't see its
```

1  relevance.

2        MR. SMITH:  I think it is relevant, your Honor.  I

3  think it goes to the very first correction the prosecutor

4  introduced, which was the time that this relationship began on

5  the 7th of August.  This alleged victim said he met my client a

6  year and a half ago.

7        On paragraph 4, in or about no later than December 7,

8  2007.  So it looks to me like they're ignoring 12 months of the

9  relationship, your Honor, so I think it is relevant.

12:02 10        THE COURT:  Well, I don't.  I sustain the objection as

11  to the question of use of other escort services.

12        MR. SMITH:  All right.

13  BY MR. SMITH:

14  Q.   Well, let me ask you this, did he give you the name of the

15  escort service he used?

16  A.   He said he did not recall the name; it was randomly

17  chosen.

18  Q.   He chose it himself.  How did he find the escort service?

19  A.   He said through the Yellow Pages.

12:03 20  Q.   Okay.  And again, this is a gentleman with sophistication,

21  has traveled the world, owns many businesses, has a

22  sophisticated financial --

23        THE COURT:  You're doing it again.  Just ask questions

24  and, you know, on specific subjects.  Don't pile it on like

25  that.

```
 1   BY MR. SMITH:
 2   Q.   He's a worldly fellow, and he found the escort service
 3   through the Yellow Pages; is that correct?
 4   A.   He found the escort service through the Yellow Pages.
 5   Q.   Okay.  And did he give you any background as to how he
 6   selected the particular escort service?
 7   A.   No.
 8   Q.   But he told you a year -- that he had met my client a year
 9   and a half ago?
10   A.   That's correct.
11   Q.   And did he ever say he met anybody else through the escort
12   service?
13   A.   No.
14   Q.   So he met her a year and a half ago, but you put December
15   2007 as the date he met her in the affidavit; is that correct?
16   A.   Yes, no later than December.
17   Q.   But he actually had met her almost 12 months before then;
18   is that correct?
19   A.   I guess a year and a half it would have been maybe not 12,
20   but --
21   Q.   And you talked to him two days ago, didn't you?
22   A.   Yes.
23   Q.   And he said then that he met her in January or February of
24   that year, didn't he?
25   A.   And that is why I -- (inaudible. )
```

```
 1    Q.   And he met her more than one time, didn't he?
 2    A.   Yes.
 3    Q.   And you characterized this in the affidavit as a
 4    sex-for-fee relationship; isn't that correct?
 5    A.   Correct.
 6    Q.   How much did he pay her for sex?
 7              MR. DOWDEN:  Objection, your Honor.
 8              THE COURT:  She may answer.
 9    A.   I don't know the answer.
10    Q.   Did you ask him?
11    A.   No.
12    Q.   At some point do you know if he was paying her money
13    consensually, unrelated to these allegations?  Is that correct?
14    A.   He was paying her money for sex?
15    Q.   No, consensually outside of the sex.
16    A.   He said that he had loaned her money, yes.
17    Q.   When you met him on August 7th, he said he had given her
18    12 to 15,000 dollars over the course of the past four or five
19    months; is that correct?
20    A.   Yes.
21    Q.   And some of that money was for living expenses; is that
22    correct?
23    A.   That's what she stated she needed it for.
24    Q.   That's what he said --
25    A.   She told him, yes.
```

Q.   So living expenses are not sex for a fee; is that correct?

A.   That's correct.

Q.   And points on interest on a real estate purchase, that's not sex for a fee, correct?

A.   Correct.

Q.   And paying money for car insurance or house payment, that's not sex for a fee; is that correct?

A.   Correct.

Q.   He gave her over 10,000, possibly 20,000 for a transaction that did not involve sex for a fee; is that correct?

A.   He characterized it as a loan, he gave her that amount of money.

Q.   Yes.  None of those transactions -- and you knew that on October (sic.) 7th, correct?

A.   Correct.

Q.   And none of those transactions are contained in this affidavit; is that correct?

A.   That is correct.

Q.   Now, have you done -- taken any investigative steps to corroborate his contact with the escort service at any time?

A.   I have -- no.  Not at this point.

Q.   You don't know who owns the escort service?

A.   I do not.

Q.   You didn't check out any phone numbers to connect him to the escort service?

1    A.    I asked him for that information.  He didn't recall.

2    Q.    He didn't recall?

3    A.    No.

4    Q.    Did you ask him to look at his telephone or BlackBerry?

5    A.    No.

6    Q.    Just so I have this right, you met with him at least four

7    times before you prepared this affidavit; is that right?

8    A.    I may have met with him four times total, but I don't know

9    if it was four times before I prepared the affidavit.

12:09 10    Q.    This affidavit was prepared the 13th of August; is that

11    right?

12    A.    Yes.

13    Q.    So you met with him on August 7th, correct?

14    A.    Correct.

15    Q.    And you met with him to help make the phone call on the

16    8th; is that correct?

17    A.    No, that's not correct.

18    Q.    You weren't present?

19    A.    No.

12:09 20    Q.    Was anybody from the FBI present?

21    A.    When he made the call, no.

22    Q.    Who facilitated the recording of that telephone call?

23    A.    It is a system that the FBI has.  Nobody needs to be

24    present with him.

25    Q.    That was an FBI-authorized phone call?

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   Did you talk with him before or after the call? |
| 3 | A.   Yes. |
| 4 | Q.   So you talked to him that day.  And then on August 11th he |
| 5 | made the other phone call; is that correct? |
| 6 | A.   Correct. |
| 7 | Q.   That was the phone call he said he was in Providence for; |
| 8 | is that correct? |
| 9 | A.   Correct. |
| 12:10 10 | Q.   Did you instruct him to say that? |
| 11 | A.   Yes. |
| 12 | Q.   Now, were you with him when he made the phone call? |
| 13 | A.   No. |
| 14 | Q.   Did you verify he was physically in Providence? |
| 15 | A.   No. |
| 16 | Q.   Because that's an important aspect of this case -- |
| 17 | THE COURT:  Is that a question or a statement? |
| 18 | MR. SMITH:  Well, I'm getting to the question, Judge. |
| 19 | THE COURT:  Please ask the question. |
| 12:10 20 | BY MR. SMITH: |
| 21 | Q.   The charge is communication, interstate communications. |
| 22 | So you don't know if he was in Providence, and you have no done |
| 23 | no examination to confirm whether he was in Providence when he |
| 24 | made that call, right? |
| 25 | A.   In order to obtain the records necessary to confirm that |

1    requires a search warrant.  I don't have those records.

2    Q.   So you don't know, all right.

3         Now, you don't know if my client was in Providence at

4    the same time, do you?

5    A.   I do not.

6    Q.   You have no idea where she was when that phone call was

7    made, right?

8    A.   Correct.

9    Q.   Hypothetically, if they were both in Providence, there's

12:12 10   no interstate communication; is that correct?

11   A.   Hypothetically that is correct.

12   Q.   And you had a detailed briefing on Monday with the alleged

13   victim; is that right?

14   A.   I would not call it detailed briefing, but she spoke with

15   us and made comments in the car ride.

16        It was the victim, I'm sorry.

17   Q.   This witness; is that right?

18        It says --

19   A.   So, yes, if that's Monday, yes.

12:13 20   Q.   He said, We started this relationship a year and a half

21   ago January, February of 2007; is that right?

22   A.   Yes.

23   Q.   And this is sort of a last hurrah, those were his words,

24   "last hurrah," correct?

25   A.   Correct.

Q.   And that was -- he wanted for his last hurrah to have sex
with a young woman, correct?

A.   Correct.

Q.   And he had a fantasy about that; is that right?

A.   Yes.

Q.   Did you ask him if there were other women involved in
either this undertaking of a last hurrah or fantasy?

MR. DOWDEN:  Objection, your Honor.

THE COURT:  Sustained.

BY MR. SMITH:

Q.   Did he have relationships with other prostitutes during
this time period?

MR. DOWDEN:  Objection.

THE COURT:  Sustained.

BY MR. SMITH:

Q.   He says he made the phone call to the escort service to
start this relationship; is that correct?

A.   That's correct.

Q.   A phone call he obtained from the Yellow Pages, correct?

A.   The number, yes.

Q.   He didn't know anybody at the escort service, correct?

A.   I don't know.  He said it was random, so I don't know if
he knew somebody there or not.

Q.   How did he know that calling an escort service would
connect him to a prostitute?

1    MR. DOWDEN:  Objection, your Honor.

2    THE COURT:  I'm going to sustain the objection.  This

3    is not a discovery hearing.  This is a hearing to determine if

4    there's evidence as to whether or not your client committed the

5    crime with which she's charged.  I don't see the relevance of

6    that question to that issue.  I mean, at trial obviously your

7    latitude will be much broader.  So I sustain the objection.

8    BY MR. SMITH:

9    Q.   Did he ever meet face to face with anybody else from the

10   escort service?

11   MR. DOWDEN:  Objection.

12   THE COURT:  Sustained.

13   BY MR. SMITH:

14   Q.   Did he talk to anybody else from the escort service?

15   MR. DOWDEN:  Objection, your Honor.

16   THE COURT:  Sustained.

17   BY MR. SMITH:

18   Q.   Before you became involved, he paid $80,000 to my client.

19   That's his allegation; is that correct?

20   A.   Correct.

21   Q.   He was able to obtain that money without telling anybody

22   or involving anybody else; is that correct?

23   A.   No, that is --

24   Q.   I'm sorry, who did he tell?

25   A.   He told his financial adviser who helped him get the

1   money.

2   Q.   Okay.  But he delivered the money allegedly to my client

3   by himself; is that right?

4   A.   That's right.

5   Q.   And at some point my client says he could have -- she

6   would return the money to him; is that correct?

7            THE COURT:  Wait, what money are we talking about?

8            MR. SMITH:  The $80,000.

9            THE COURT:  All right.  You may answer.

12:18 10   BY MR. SMITH:

11   Q.   Is that correct?

12   A.   Yes.

13   Q.   And that transaction took place on July 23rd of 2008; is

14   that correct?

15   A.   Which transaction?

16   Q.   The $80,000 transaction.

17   A.   Giving it to her, or her saying she would return it?

18   Q.   No, him giving to her.

19   A.   I'm not sure exactly the date, but that sounds correct.

12:19 20   Q.   And she offered to return it; is that right?

21   A.   That is correct.

22   Q.   And he told her to keep it, right?

23   A.   Yes.

24   Q.   Did you ask him if he ever traveled with the defendant?

25   A.   No.

```
 1   Q.   Did you tell him he had to tell you the truth?
 2            MR. DOWDEN:  Objection, your Honor.
 3            THE COURT:  Sustained
 4   BY MR. SMITH:
 5   Q.   Did you ask to examine his BlackBerry?
 6   A.   Yes.
 7   Q.   And did you obtain records from his BlackBerry?
 8   A.   Yes.
 9   Q.   Where are those records?
10   A.   At my office.
11   Q.   Did he delete records on his BlackBerry?
12   A.   Yes.
13   Q.   So the transaction that happened prior to the 23rd of July
14   of 2008, he had deleted it, right?
15   A.   I don't know what dates.  He had text messages, some of
16   which he told us had been deleted.
17   Q.   Text messages between him and my client, right?
18   A.   Correct.
19            (Pause.)
20   Q.   So while you described this as a sex-for-fee relationship,
21   there was more than just that, wouldn't you agree at this
22   point?
23            MR. DOWDEN:  Objection, your Honor.
24            THE COURT:  It doesn't matter for these purposes what
25   the relationship was prior to the point in time where the
```

```
 1    alleged criminal action occurred.

 2           I'm going to sustain your objection.  I say at trial

 3    you'll have a lot more latitude, but for purposes of this

 4    hearing -- and besides, you've already established that from

 5    the evidence, you're just asking her a conclusory follow-up

 6    question.  So I sustain the objection.

 7           MR. SMITH:  Thank you, your Honor.

 8           Can I have a minute, please?

 9           THE COURT:  Sure.

10           (Discussion off the record.)

11    BY MR. SMITH:

12    Q.   Now, you talked about going to a travel agency where my

13    client had booked some tickets.

14    A.   That's correct.

15    Q.   Those were round-trip tickets, weren't they?

16    A.   Yes.

17    Q.   So she was leaving on vacation and then returning from

18    vacation?

19    A.   Correct.

20    Q.   And it was going to be herself, a male, and two children;

21    is that right?

22    A.   Correct.

23    Q.   And all of them were going and all of them were coming

24    back; is that right?

25    A.   Correct.
```

1    Q.   And you said you found some Social Security cards; is that

2    right?

3    A.   Yes.

4    Q.   You found three?

5    A.   Correct.

6    Q.   Two of them were for my client; is that right?

7    A.   Mm-hmm.

8    Q.   Did you verify the accuracy of the Social Security Number?

9    A.   The Social Security is the same as her driver's license.

12:24 10    Q.   Okay.

11             And then one card was for her daughter; is that

12    correct?

13    A.   I don't know if it was a daughter.  It was another name, I

14    believe it was Heaven, but I'm not positive.

15    Q.   And have you checked with the passport office to determine

16    if they issued passports?

17    A.   No.

18    Q.   And Exhibit 2 and Exhibit 3, the alleged victim, he

19    initiated both of those calls; is that correct?

12:25 20    A.   Correct.

21    Q.   And there has been no calculation concerning the economic

22    consequences of the disclosure of the information to anybody,

23    has there?

24             MR. SMITH:  Let me rephrase the question, your Honor.

25    Let me rephrase the question.

```
 1   Q.   I heard him say it's a devastating outcome and it's pain

 2   and suffering, but at no time did my client threaten to contact

 3   the victim's wife, directly?

 4   A.   Not that I'm aware of.

 5   Q.   Or her -- or his business associates; is that correct?

 6   A.   Not that I'm aware of.

 7        (Pause.)

 8   Q.   And while they met during this relationship, he gave the

 9   money directly to her, is that correct, at all times?

10   A.   The money you're talking about, the $80,000 and the

11   $200,000.

12   Q.   I'm sorry, when we talk about the escort aspect, this

13   sex-for-fee relationship, he didn't pay the escort service by

14   check at any point; is that correct?

15        MR. DOWDEN:  Objection, your Honor.

16        MR. SMITH:  I think it goes right to --

17        THE COURT:  He may ask that because it's been opened

18   up as far as do you know whether or not the money he paid for

19   sex were paid directly to her or to some service.  Do you know

20   one way or the other?

21        THE WITNESS:  I don't.  Maybe if I could review, he

22   may have said he paid her cash but I don't know that with

23   certainty.  I don't know how he paid her.

24   BY MR. SMITH:

25   Q.   But if he did pay her, he paid cash?
```

1    A.    I don't know for certain.

2    Q.    Did you ask to review any of his caneled checks or credit

3    cards?

4              MR. DOWDEN:  Objection, your Honor.

5              THE COURT:  Getting into the investigation again, I

6    don't think you're entitled to do that.

7    BY MR. SMITH:

8    Q.    Now, you discussed your review of my client's record,

9    prior record.  As she sits here today she has no convictions;

12:28 10    is that correct?

11   A.    That's correct.

12   Q.    Has not been convicted of any crime; is that right?

13   A.    Correct.

14   Q.    And those warrants you talked about, they were all

15   recalled and the cases contained in the warrants have been

16   dismissed; is that correct?

17   A.    I think that's correct, I think --

18   Q.    With the exception of the BMC case?

19   A.    That's correct.

12:28 20    Q.    And we talked about the different names.  Have you done

21   any background check to see what name she was born with?

22   A.    I know that Garcia is the last name of her mother and

23   Wilkinson is the last name of her father.

24   Q.    And she was married to a person named Khalil Robinson?

25   A.    That I did not know until actually just before coming into

1   court.

2   Q.   Today?

3   A.   Yes.

4   Q.   You talked about a safe deposit box.  Have you examined

5   the contents of that safe deposit box?

6   A.   No.

7   Q.   You talked about an address in Canton.  Have you been to

8   that address?  Have members of your investigative team been to

9   that address?

12:30 10   A.   I have been by that address, yes.

11   Q.   Has any member of your investigative team or yourself ever

12   knocked on the door?

13   A.   No.

14   Q.   Have you talked to the building manager to determine who

15   lives there?

16        MR. DOWDEN:  Objection, your Honor.

17        THE COURT:  I sustain the objection.  I'm sorry.

18        MR. SMITH:  I think that would go more to a detention

19   aspect, I think maybe --

12:31 20        THE COURT:  All right.  I'm sorry, if you're asking if

21   there was any verification -- if she knows or has received any

22   verification as to who lives there, I'll let her answer that

23   question.

24   A.   From that location, no.

25   Q.   So as far as this address -- I'm sorry.

```
 1              Paragraph 4 of the complaint, page 2 of your
 2     affidavit, you didn't confirm that date was wrong until
 3     yesterday; is that correct?
 4     A.   "No later than."  I confirmed an actual date, but he had
 5     stated prior to this, prior to the 13th, a year and a half.
 6              MR. SMITH:  I don't have any further questions at this
 7     time.
 8              THE COURT:  Any further questions, Mr. Dowden?
 9              MR. DOWDEN:  Yes, a couple of very quick question,
12:32  10     your Honor.
11                        REDIRECT EXAMINATION
12     BY MR. DOWDEN:
13     Q.   With respect to Government Exhibit 2, the telephone call
14     that occurred on August 11, 2008, did you ask the victim
15     whether he was, in fact, in Providence, Rhode Island during
16     that telephone call?
17     A.   Yes.
18     Q.   What did he say?
19     A.   He said that he was.
12:33  20     Q.   Did you know that -- what else did he say about why he was
21     there, what he was doing there?
22              Did he say he traveled there?
23     A.   That day he said he traveled there, yes.
24     Q.   And you had no reason to believe that that was not
25     accurate?
```

```
 1   A.   No, I did not.
 2   Q.   With respect to the defendant's cellular telephone, did
 3   you undertake to review any of her cell phone records at any
 4   point in this investigation, including registration, billing,
 5   that type of information?
 6   A.   Yes.
 7   Q.   To who is that cell phone registered?
 8   A.   Michelle Robinson.
 9   Q.   And what is the billing address for that?
10   A.   341 Bolivar Street, Canton, Mass.
11   Q.   Prior to the 11th, the previous communications between the
12   victim and the defendant occurred where?
13   A.   Prior communications between her cell phone and his cell
14   phone.
15   Q.   And actual physical meets, where did they occur?
16   A.   He stated at two hotels in Cambridge I want to say, twice
17   in -- a few times in Dedham --
18   Q.   With respect to the specific cash transactions.
19   A.   Once in Newton at the Marriott Hotel, and once in Dedham
20   at the Costco wholesale store.
21   Q.   And your investigation shows that the defendant has
22   addresses where?  Home addresses where?
23   A.   Home addresses in Canton, Jamaica Plain, Stoughton.
24   Q.   In the Boston area?
25   A.   Yes, in the Boston area.
```

```
 1   Q.   You were asked at one point during direct examination
 2   whether the defendant in this case told the victim that she
 3   would give the money back.  Did she make any further statements
 4   in response to the defendant about giving the money back?
 5   A.   She said that she would give it back if she could get more
 6   from him.
 7        MR. DOWDEN:  No further questions, your Honor.
 8        THE COURT:  I have a question.  You said that when
 9   they went to the travel agency the -- I believe you said the
10   travel was for her, the gentleman, and her two children.  What
11   were the names of the children that were going on this trip?
12   Do you remember?
13   A.   Heaven Robinson and Jordan I believe Iverson.  The last
14   name I don't remember.  It was not the same last name.
15        THE COURT:  How would -- on what basis do you say that
16   they were her children?
17        THE WITNESS:  That's what the travel agent told me,
18   that they were hers.
19        THE COURT:  Thank you very much.  You may --
20        MR. SMITH:  Can I ask one question, your Honor?
21        THE COURT:  Yes.
22                       RECROSS-EXAMINATION
23   BY MR. SMITH:
24   Q.   Agent, with the exception of the August 11, 2008 phone
25   call, all the meetings took place in Massachusetts; is that
```

1    right?

2    A.   Correct.

3    Q.   And the government --

4         THE COURT:   That's one question.  Do you have another?

5         MR. SMITH:   One more?

6         THE COURT:   Okay.  Go ahead.  Very dangerous to say "I

7    only have one more question."

8         MR. SMITH:   I apologize, your Honor.

9    BY MR. SMITH:

12:37 10   Q.   The government suggested that he go to Providence for that

11   phone call on August 11th; is that correct?

12   A.   That's correct.

13        MR. SMITH:   Thank you.

14        No further questions, your Honor.

15        THE COURT:   Thank you.  You may step down.

16        Does the government have any further evidence?

17        MR. DOWDEN:   No, your Honor.

18        THE COURT:   Have you gone over the Pretrial Services

19   Report with your client, and if so, can I consider the facts

12:37 20   contained therein as evidence?  Mr. Smith?

21        MR. SMITH:   I have discussed it -- I have not had a

22   chance to discuss it in detail with my client because I

23   received it as I walked into the courtroom.

24        THE COURT:   Why don't you go over it with her.  I just

25   want to know if I can consider the facts contained in there as

```
 1    evidence.  That's what I need to know.
 2              MR. SMITH:  Yes.
 3              THE COURT:  Go ahead.
 4              (Defendant conferred with counsel.)
 5              MR. SMITH:  I have had a chance to review it with my
 6    client, your Honor.  I have one --
 7              THE COURT:  Correction?
 8              MR. SMITH:  Correction.
 9              THE COURT:  Go ahead.
10              MR. SMITH:  The assessment of danger, they talk --
11              THE COURT:  I'm sorry, I should -- I'm not asking you
12    to -- on those.  That's -- that's really their conclusions.
13              I'm talking about the factual matters, basically the
14    introductions, the history of residence, family ties,
15    employment, financial resources, and the criminal record is
16    really -- that's what I'm interested in.
17              MR. SMITH:  I have some additional information to
18    supplement the Court.
19              THE COURT:  Sure.  You'll have a chance to do that.
20              Is there anything inaccurate about this?
21              MR. SMITH:  No, your Honor.
22              THE COURT:  And I can consider it?
23              MR. SMITH:  You may.
24              THE COURT:  Thank you.
25              Now, Mr. Smith, what do you have to present?  Any
```

12:38 (line 10)
12:39 (line 20)

1    witnesses?

2              MR. SMITH:  No, I'm not calling any witnesses.

3              THE COURT:  Do you have evidence to proffer?

4              MR. SMITH:  I have evidence to proffer on the

5    detention issue.

6              THE COURT:  Okay.  I'll hear you.

7              MR. SMITH:  My client has used three different names

8    because she's had legally three different names in her life.

9    She was born Michelle Wilkinson.  Her father is here today to

12:39 10   attest to that.  She was married as a young teenage -- I guess

11   an older teenager to Khalil Robinson, and she changed her name

12   to Khalil (sic.) Robinson.  And she maintained that name --

13             THE COURT:  You mean Michelle Robinson.

14             MR. SMITH:  I'm sorry, Michelle Robinson.  And she has

15   a daughter, Heaven Robinson, who is approximately eight years

16   old.

17             THE COURT:  Right.  That's in the report.

18             MR. SMITH:  She divorced Khalil Robinson in 2006, and

19   decided at that point, at least for purposes of the Probate

12:40 20   Court, to accept her mother's last name, to not use Robinson,

21   but to use Garcia.  I have the certified records from the

22   Probate Court to verify that.

23             THE COURT:  Verifying that she used the name there or

24   that there was some --

25             MR. SMITH:  After the divorce, the date the divorce

 1    decree was entered, she chose not to continue using Robinson,

 2    at least as her married name.

 3         THE COURT:  Right.

 4         MR. SMITH:  Okay.  I have those documents if it would

 5    be helpful to you.

 6         THE COURT:  Well, I don't know, but if you would like

 7    to present them, I'd being pleased to receive them.

 8         Do you have copies for Mr. Dowden?

 9         MR. SMITH:  Yes, I do.

12:41 10         THE COURT:  Okay, fine.

11         (Pause.)

12         THE COURT:  Thank you.

13         MR. SMITH:  There's been some discussion -- I'm sorry,

14    your Honor, I'll let you finish looking at them.

15         THE COURT:  Thank you.  I got those.  They will be

16    Defendant's Exhibit 4.

17         (Exhibit 4 received into evidence.)

18         MR. SMITH:  And we concede, your Honor, that my

19    client -- there is, as we sit here today, a default warrant out

12:42 20    of the Boston Municipal Court for a driving with a suspended

21    license charge.  I've been to the Boston Municipal Court, I

22    have a certified copy of the docket sheet.  Both of her names

23    are on that, both Michelle Garcia and Michelle Robinson are on

24    that docket sheet.  She actually went in November 14th in an

25    attempt to reconcile that.  For reasons that may be unique to

1    the Boston District Court, it did not get resolved that day.

2              THE COURT:  She went in when?

3              MR. SMITH:  November 14th of 2007.  She appeared in

4    court.

5              THE COURT:  Yeah.

6              MR. SMITH:  Came in to remove the default, the default

7    did not get removed.

8              THE COURT:  It says there were warrants issued on that

9    date.

12:43 10           MR. SMITH:  She was in court that date.

11             THE COURT:  Why don't we mark the records, and I'll --

12   let me look at them, because, actually, I was going to ask the

13   Pretrial Services to look into this, but if you've already done

14   it, that will be very helpful.

15             Those will be defendant's 5.

16             (Exhibit 5 received into evidence.)

17             MR. SMITH:  So this is the only outstanding state

18   court issue, your Honor.

19             THE COURT:  All right.  Let me just see this.

12:43 20           (Pause.)

21             THE COURT:  This entry from November 14, 2007 is very

22   confusing.  It says, Defendant Michelle Robinson at counter to

23   remove default, sat room 17-78, or something like that.  Room

24   17, 3:42 defendant not in court.

25             MR. SMITH:  Right, what happens at the BMC is you have

 1    to go to the clerk's office and then they have to pull the

 2    file.

 3              THE COURT:  Right.

 4              MR. SMITH:  They have to send it down to a courtroom.

 5              THE COURT:  Right.

 6              MR. SMITH:  And there are many courtrooms in the BMC.

 7    This one got sent to room 17, and 3:42, when they called the

 8    case, Mrs. Garcia, Mrs. Robinson wasn't there.  But they had

 9    both names --

12:44 10          THE COURT:  And what explanation is there for that?

11              MR. SMITH:  I believe she will tell you, your Honor,

12    that she thought she said to come back the next day, it was

13    late in the day, they weren't going to reach it then.  The

14    papers ultimately do get to the courtroom.  There's usually a

15    one-hour delay in the sending of the papers --

16              THE COURT:  Did she go back the next day?

17              MR. SMITH:  No.

18              THE COURT:  Okay.

19              What other evidence do you have to offer, sir?

12:45 20          MR. SMITH:  Just that the fourth child -- the fourth

21    person named on the airplane tickets, a child named Jordan, is

22    not my client's child, it's her niece.  That child's mother is

23    my client's sister.  She's in court today.

24              THE COURT:  Okay.

25              And when is your -- the child, that child's name that

```
 1    was going on the trip was Jordan whom?

 2              (Discussion off the record.)

 3              MR. SMITH:  Jordan Rivas.

 4              THE COURT:  R-i-v-a-s?

 5              MR. SMITH:  I believe so.

 6              THE COURT:  And what is the sister's name?

 7              MR. SMITH:  Rivers, R-i-v-e-r-s.  I'm sorry, your

 8    Honor.

 9              THE COURT:  And the sister's name is --

10              MR. SMITH:  Monique Wilkinson.

11              THE COURT:  I'm sorry?

12              MR. SMITH:  Monique Wilkinson.

13              THE COURT:  Okay, thank you.

14              Any other evidence to proffer?

15              MR. SMITH:  No, your Honor.

16              THE COURT:  Okay.  I'll hear the government -- first

17    of all, Mr. Smith, do you wish to be heard on the issue of

18    probable cause?

19              MR. SMITH:  Yes, Judge, briefly.

20              THE COURT:  Okay.

21              (Pause.)

22              MR. SMITH:  Just two points on probable cause issue,

23    your Honor.

24              I think there's only one phone call that the

25    government can contend that brings this within the statute, the
```

1    out of state commerce, and I believe that's the call made on

2    August 11th.

3          My client did not initiate that call.  The alleged

4    victim initiated that call, and I believe the statute requires

5    her to cause a transmission to be sent.  She certainly didn't

6    cause that transmission to be sent.  I don't believe they've

7    met the burden that's required --

8          THE COURT:  She caused it by saying it.

9          Let me take a look at the statute, but it seems to

02:42 10   me -- I'm not sure if it makes a difference who initiated that

11   call if she over that call in interstate commerce communicates

12   a threat.

13         MR. SMITH:  I think she has to cause the transmission

14   to be sent, your Honor.

15         THE COURT:  Transmits in interstate commerce any

16   communication communicating any threat to injure the reputation

17   of another.  It's the communication that is the crime.  I don't

18   think she has to initiate the call.

19         And what's the other point on probable cause?

02:43 20   MR. SMITH:  The other point is -- just a moment, your

21   Honor.

22         (Pause.)

23         MR. SMITH:  I would argue that the exposure here would

24   not necessarily injure the reputation, the financial reputation

25   of this particular individual.  It's his family members may not

1    like it, they may not appreciate it --

2          THE COURT:  Hold on, let me go back to the statute.

3          (Pause.)

4          THE COURT:  Why does it have to be financial

5    reputation?  Just reputation in the community according to the

6    statute.

7          MR. SMITH:  I think if you look at the statute, this

8    is taken from the Hobbs Act it, talks about financial harm.

9          THE COURT:  Well, I'm looking --

02:44 10          MR. SMITH:  And let me address --

11          THE COURT:  I'm looking at 875(d).  Whoever who

12    intends to extort from any person any money, transmits in

13    interstate commerce any communication containing any threat to

14    injure the reputation of the addressee.

15          Nothing about financial reputation.  It's not limited

16    to financial reputation.  It could be financial reputation, but

17    certainly not limited to that.

18          MR. SMITH:  My argument would be I don't think the

19    government has demonstrated that this would necessarily injure

02:45 20    his reputation.

21          THE COURT:  Why would he agree to pay her all this

22    money upon her threat to go to this reporter if it wasn't going

23    to injure his reputation?

24          MR. SMITH:  I don't know, your Honor.

25          THE COURT:  For probable cause purposes, Mr. Smith, I

1    think the government has met their burden.

2              Any other point on probable cause?

3              MR. SMITH:  Well, the only other argument I have is on

4    the extortion requirement, your Honor.  I think the only

5    definition we could find of extortion, again, was in the Hobbs

6    Act.  The Hobbs Act requires fear of economic fear or physical

7    harm.  And I don't think it's been demonstrated here of

8    economic harm.

9              THE COURT:  Well, I don't know they've shown that, it

02:46 10   may be able to infer it, but I read the statute as it's

11   written, which says "injure the reputation."  And in my

12   judgment the evidence is sufficient to establish that the

13   defendant -- that there is probable cause to believe the

14   defendant committed a violation of that statute.  I so find and

15   she's held to answer to the grand jury.

16             Now, let me hear Mr. Dowden on the issue of detention,

17   and then I'll hear you on that, Mr. Smith.

18             MR. DOWDEN:  Yes, your Honor.  The government does

19   believe that Ms. Robinson does pose a risk of flight and is

02:47 20   moving for pretrial detention this case.

21             As the Court heard in the numerous telephone calls

22   that the United States played, the defendant has said on

23   numerous occasions, I need this money, I'm leaving.  I'm

24   leaving, I've got to get out of here, my bags are packed.

25             She talks about the fear of having to appear at a

1    court proceeding, doesn't want to appear before the judge.

2            She further has evidenced by her criminal record has

3    defaulted on at least three prior occasions.  Some of those

4    defaults have subsequently been removed, but they do evidence

5    an intent not to show up for certain court proceedings.

6            Your Honor, the government also has concerns about the

7    number of aliases the defendant has used.  While the government

8    recognizes there might actual be familial ties to those

9    aliases, the way she has used those aliases is of concern.

02:48  10    She's used those aliases to obtain debit cards and credit cards

11    in other names.  And her criminal record is under different

12    names.  That is of concern.

13            Your Honor, additionally, there is a large amount of

14    unaccounted cash in this case, some 280,000 cash that's

15    unaccounted for.  The government believes that the existence of

16    this amount of money could give the defendant substantial lead

17    time in absconding.

18            Your Honor, there is also the passports that were

19    applied for on an expedited basis.  The government understands

02:48  20    that the government did have some --

21            THE COURT:  That was just for the child as I

22    understand.

23            MR. DOWDEN:  No, there was also a passport received

24    that actually hand on it handwritten "Michelle" at the top of

25    it, as well one that said "Heaven" and one said "Michelle."

1        THE COURT:  Was there any date on them?

2        MR. DOWDEN:  Yes, your Honor, they were August 8,

3    2008.

4        Your Honor, the defendant has also had multiple

5    addresses.  In this case among them is an address of a public

6    housing facility in Jamaica Plain and in Canton.  And that's of

7    concern.

8        I'm just trying to think, your Honor, if there's

9    anything else.

02:49 10        The passport applications, and obviously again, main

11    concern in this case is the large, large amount of unaccounted

12    cash that would allow this defendant a quick opportunity to

13    change her identity quickly and abscond.

14        Thank you, your Honor.

15        THE COURT:  Okay.  Mr. Smith.

16        MR. SMITH:  Your Honor, I believe the Pretrial

17    Services report outlines a recommendation that would be

18    acceptable and is reasonable given the circumstances of this

19    case.  My client has used three different names because she's

02:49 20    had three different names, and we have presented all those

21    documents to the Court, they're all legal, lawful names.

22        My client has used two different addresses because her

23    father lives at the Canton address, her daughter lives --

24    resides at that address and will be attending school in Canton

25    in the fall.  She also has an address in Boston.

1          My client's father is here.  My client's mother, whose

2     last name is Garcia, is here.  My client's two sisters are here

3     today, and her brother are all here.  So she has significant

4     family ties.

5          THE COURT:  Does the father own the residence at 341

6     Bolivar Street?

7          MR. SMITH:  No, he rents that residence I believe.

8          THE COURT:  Thank you.

9          MR. SMITH:  The father lives there.  Her father

02:51 10    initially was employed for ten years as a dispatcher for the

11    Boston Medical Center.  Prior to that, for seven years, was a

12    prison guard in Walpole.  I think he'd be an excellent

13    candidate for her to reside with, would be willing to notify

14    the Court if there are any issues that have to be brought to

15    the Court's attention.  I think the circumstances outlined in

16    the Pretrial Service recommendation are adequate.

17          And, yes, the government has talked about the size of

18    the money and the size of this case, but the maximum sentence

19    my client faces if she were to be convicted, your Honor, is 24

02:52 20    months.

21          THE COURT:  I understand that, but I do understand

22    their concern that there is, based on the evidence before me,

23    $280,000 which she received which certainly would give her the

24    means to flee.  I'd be -- so I think that's a matter of

25    concern, Mr. Smith.

1          MR. SMITH:  I have her passport, which was received by

2     her family in the mail yesterday.  I'd be happy to surrender

3     that, your Honor, if that would satisfy that aspect.  We could

4     put reporting requirements in place if that would also help to

5     satisfy that condition.

6          She'd be willing to do drug testing.

7          And given the fact that she's grown up in this area

8     and lived virtually her entire life in this area, I think she

9     has sufficient strong family ties to warrant the recommendation

02:53 10   of the Probation Department -- Pretrial Services.

11          THE COURT:  Let me ask this, does her father work?

12          MR. SMITH:  Yes.  He works at the Boston Medical

13     Center where he's worked for the last ten years.  He works the

14     3:00 to 11:00 shift.

15          THE COURT:  And does anyone else live at 1341 Bolivar

16     Street?

17          MR. SMITH:  No.  The intention would be for her

18     daughter to live there and attend schools with her, with her

19     mother present.

02:53 20          THE COURT:  Okay, thank you.

21          I'm sorry, did you have anything else, Mr. Smith?

22          MR. SMITH:  No, I think --

23          THE COURT:  Mr. Dowden, let me ask you this.  You have

24     a situation here where Mr. Smith is correct, it's a two-year

25     maximum sentence, and --

1          MR. DOWDEN:  Your Honor, to be frank, this case is

2    also a case that could be and likely would be charged under the

3    Hobbs Act if it was presented --

4          THE COURT:  Well, I've got to deal with the charge

5    that I've got before me now.  If you go to the grand jury and

6    you get an additional charge, that's something else.  But at

7    this point in time I have to deal with the charge before me.

8          MR. DOWDEN:  Yes, sir.

9          THE COURT:  Which is a two-year --

02:54 10          The issue, of course, is whether any condition or

11    combination of conditions will reasonably assure her

12    appearance.

13          MR. DOWDEN:  Yes, sir.

14          THE COURT:  I'm wondering what your view would be if I

15    appoint her father third-party custodian -- have you

16    interviewed the third-party custodian for just those purposes

17    or did you just interview him to verify the information was

18    correct?

19          PRETRIAL SERVICES OFFICER:  I did interview him fairly

02:55 20    extensively.

21          THE COURT:  Third-party custodian and electronic

22    monitoring, what would you --

23          MR. DOWDEN:  I guess one of my concerns is I don't

24    know if there's been a criminal records check associated with

25    the individual who would be a third-party custodian in this

1      case?

2            THE COURT:  That would obviously would be done.

3            Assuming for the second that Pretrial does the

4      necessary investigation of her father and comes up with a

5      recommendation that, based on their findings that he would be a

6      suitable third-party custodian and I release her on electronic

7      monitoring, which would prohibit her to leave the house except

8      in his presence for limited purposes.  Now, that's not a

9      guarantee, but the statute doesn't require a guarantee.  All

02:56 10     the statute requires is reasonable assurance.

11            So I really want to know -- of course we have to deal

12     with the Boston case first.  That would be something -- but you

13     know, given all of that, my question would be why do you think

14     that that would not reasonably assure -- reasonably assure her

15     appearance?

16            MR. DOWDEN:  Your Honor, a couple of reasons.

17            THE COURT:  Go ahead.

18            MR. DOWDEN:  The first would be that, as the Court

19     heard in the tapes, the defendant has said repeatedly, I am out

02:57 20     of here, I am out of here, my bags are packed, I don't want to

21     go before that judge.  She has expressed an intent, even in the

22     matter if it's the BMC court, or whatever it is, that is not

23     facing serious exposure in terms of criminal time.  So she has

24     expressed an intent to avoid court orders.

25            The cash again is a big concern.  That's a lot of

1    money, your Honor.  And the defendant could just as easily cut

2    a bracelet off and have lead time with $280,000 in cash.

3         The nature of the defendant's employment is also of

4    concern, your Honor.

5         THE COURT:  She wouldn't work.  She'd be confined to

6    the house on electronic monitoring.  She's not going to go out

7    to work.  First of all, there's nothing indicating that -- in

8    the Pretrial Services Report that she has any skills to engage

9    in conduct that would be permissible by the Court, or

02:57 10   employment that the Court would permit her to engage in.  So

11   I'm not concerned about that.

12        I understand your point about the money, and that is a

13   concern, I agree with you on that.

14        MR. DOWDEN:  And the evidence that she has, in fact,

15   applied for passports under Michelle Robinson, and the fact

16   that her name is now apparently Michelle Garcia, which she's

17   lawfully changed it to Michelle Garcia.  She's opened bank

18   accounts in Michelle Garcia but came in Michelle Wilkinson.

19        THE COURT:  Let me ask Mr. Smith, how did she apply

02:58 20   for a passport in the name of Michelle Robinson if Michelle

21   Robinson is not her name anymore?

22        MR. SMITH:  Social Security card is still in Michelle

23   Robinson.  She wanted to go on this trip, she didn't want to

24   change her Social Security card --

25        THE COURT:  Don't you usually have to show a birth

1    certificate to get a passport?  That's my experience.

2              MR. SMITH:  I think a Social Security card, your

3    Honor, but I'm not an expert on the passport office.  I have

4    her passport right here in front of me --

5              THE COURT:  Maybe Mr. Gray can enlighten us?

6              PRETRIAL SERVICES OFFICER:  I wasn't going to talk

7    about that.

8              THE COURT:  You can say something else.

9              PROBATION OFFICER:  If the Court would like, I do have

02:59 10   a record for the proposed third party.  I have also spoken to

11   him.  He doesn't have a phone line that he could dedicate at

12   this time, but he said he would be more than happy to have one

13   installed.

14             THE COURT:  Wait a minute, hold on a second.

15             This is whose record?

16             PROBATION OFFICER:  I believe that's the record for

17   her father, for Mr. Wilkinson.

18             THE COURT:  Joseph Conway?

19             PROBATION OFFICER:  I believe that's listed as an

03:00 20   alias.

21             THE COURT:  All right.  Here's what I'm going to do.

22   I'm going to ask you to get this in the form that you usually

23   give it to me in so I can have that, and let me take the matter

24   under advisement.

25             Do you have anything further, Mr. Smith?

1          MR. SMITH:  No, just as far as the Boston Municipal

2     Court, you could release her to home confinement, have her

3     go --

4          THE COURT:  No, I can't do -- what I think I'm going

5     to do -- let me pose this to you.

6          I will allow the -- the minute I release her, the

7     marshals will hold her for someone to come and get her.  I

8     would be willing to release her with a detainer so that they

9     would take her to the Boston Municipal Court.  If they held

03:01 10   her, she'd be held there with a detainer.  If they released

11    her, she'd just be back here, and then I'd make my decision.

12    If you want me to do that, I'm willing to do that.  In other

13    words, she wouldn't leave custody one way or the other.  She'd

14    either be in the state authorities with a detainer or she'd be

15    bounced back here and she'd be in federal custody, and I'll

16    have to make my decision.

17         MR. SMITH:  Once she came back --

18         THE COURT:  That's right, if they released her after a

19    court appearance, they do whatever they want to do, they'd

03:01 20   either set a bail or release her and give her a new court date.

21         MR. SMITH:  So presumably we'd be back here on Friday?

22         THE COURT:  I'm not sure when we'd be back here.  I

23    don't know how long that would take, and I don't know that you

24    have to come back before me.  I've got all the information I

25    need pending that.

1          Is that something you would like me to do?

2          MR. SMITH:  Let me explain that to my client.

3          THE COURT:  Sure, go ahead.

4          (Defendant conferred with counsel.)

5          MR. SMITH:  That's fine, your Honor.

6          THE COURT:  You would like me to do that?

7          MR. SMITH:  Yeah, I think we could clarify, vacate

8   that outstanding warrant and move on.

9          THE COURT:  All right.  I'll issue that order.  And

03:02 10   I'll await the full -- the record that's in the form that I'm

11   used to looking at it in, and I will take -- otherwise take the

12   matter under advisement.

13          Anything further from either side?

14          MR. SMITH:  No, your Honor.

15          MR. DOWDEN:  Nothing further from the government, your

16   Honor.

17          THE COURT:  All right, thank you.

18          Court will be in recess.

19          THE CLERK:  All rise.

03:03 20          (Court adjourned.)

21                      - - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/Debra M. Joyce                    May 13, 2019
Debra M. Joyce, RMR, CRR, FCRR       Date
Official Court Reporter

1                                  <u>INDEX</u>

2

3   <u>WITNESS</u>                                                    <u>PAGE</u>

4

    NANCY McCORMICK
5
        Direct Examination                                         4
6       By Mr. Dowden
        Cross-Examination                                         17
7       By Mr. Smith
        Redirect Examination                                      37
8       By Mr. Dowden
        Recross-Examination                                       39
9       By Mr. Smith

10

11                              E X H I B I T S

12

13  <u>Exhibit No</u>.            <u>Description</u>                  <u>Received</u>

14

        2                  Recording                             10
15
        3                  Recording                             10
16
        4                  Probate court records                 43
17
        5                  BMC court records                     44
18

19

20

21

22

23

24

25