1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3   _____

    UNITED STATES OF AMERICA,
4

                        Plaintiff,        Criminal Action
5                                         No. 08-mj-00423-RBC
    V.
6                                         November 17, 2008
    MICHELLE ROBINSON,
7

                        Defendant.
8   _____

9

10

11                  TRANSCRIPT OF MOTION HEARING

12          BEFORE MAGISTRATE JUDGE ROBERT B. COLLINGS

13                 UNITED STATES DISTRICT COURT

14              JOHN J. MOAKLEY U.S. COURTHOUSE

15                      1 COURTHOUSE WAY

16                    BOSTON, MA  02210

17

18

19  Court Reporter:
    Proceedings recorded by electronic sound recording, transcript
20  Produced by transcription service.

21

22
                    DEBRA M. JOYCE, RMR, CRR, FCRR
23                     Official Court Reporter
                    John J. Moakley U.S. Courthouse
24                  1 Courthouse Way, Room 5204
                        Boston, MA  02210
25                     joycedebra@gmail.com

```
 1    APPEARANCES:

 2    FOR THE GOVERNMENT:

 3    MARK D. SMITH, ESQ.
      Laredo & Smith, LLP
 4    101 Federal Street, Suite 650
      Boston, MA 02110
 5    617-443-1100

 6    FOR THE DEFENDANT:

 7    JAMES P. DOWDEN, ESQ.
      Ropes and Gray
 8    800 Boylston Street
      Prudential Tower
 9    Boston, MA 02219
      617-748-3334
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open court before Magistrate Judge Robert B. Collings, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on November 17, 2008.

The defendant, Michelle Robinson, is present with counsel.  The Assistant U.S. Attorney is present.)

THE CLERK:  All rise.

The United States District Court for the District of Massachusetts, Robert B. Collings presiding, is now in session.

All persons having business before the Court are advised to draw near, give their attendance, and they shall be heard.  God save the United States and this honorable Court.

THE COURT:  You may be seated.

THE CLERK:  The case of the United States v. Michelle Robinson, criminal action 08-mj-00423 will now be heard before this Court.

Counsel please identify themselves for the record.

MR. DOWDEN:  Good afternoon, your Honor.  James Dowden on behalf of the United States.

THE COURT:  Good afternoon.

MR. SMITH:  Good afternoon, your Honor.  Mark Smith for Michelle Robinson.

THE COURT:  Is this motion pressed, this motion to

```
  1   withdraw, Mr. Smith?

  2            MR. SMITH:  I think the Court should inquire of my

  3   client, your Honor.

  4            THE COURT:  Ms. Robinson, if you'd stand.

  5            MR. SMITH:  Your Honor, may we approach?

  6            THE COURT:  No, I'm not going to approach.  If you

  7   want to do it out of -- ex parte, that's fine.

  8            MR. SMITH:  Yes.

  9            THE COURT:  All right.  I ask the court to be cleared

09:00  10   except the U.S. Marshals, the defendant, and counsel.

 11            (Courtroom was cleared.)

 12            THE COURT:  Ms. Robinson, what is your position on

 13   this motion to withdraw, which has been filed by Mr. Smith?

 14            THE DEFENDANT:  I would like to keep him.

 15            THE COURT:  I'm sorry?

 16            THE DEFENDANT:  I want to keep him as a lawyer.

 17            THE COURT:  All right.  I will deny the motion then,

 18   and we'll have everybody back in.

 19            MR. SMITH:  Thank you, your Honor.

09:01  20            THE COURT:  Thank you.

 21            (Courtroom reopened.)

 22            THE COURT:  Okay.  Mr. Dowden, are you ready to go

 23   forward with the motion to reconsider detention and laying the

 24   foundation for the playing of these tapes?

 25            MR. DOWDEN:  Yes, your Honor.
```

1          THE COURT:  Proceed.

2          MR. DOWDEN:  Just I suggest a few matters, your Honor.

3    The government is under the impression that the Court's recent

4    opinion in United States v. Novak, 531 F.3 99, is governing,

5    which said that for Fourth Amendment purposes, a client can

6    consent to monitoring of prisoner telephone calls.  And in

7    Novak the relevant issue, the side issue was recording attorney

8    telephone calls.

9          Under the facts of that case, there were signs

09:05 10   preplaced on all phones that the inmates had access to which

11   said the calls were being recorded.  Similarly, the inmates

12   were warned the calls were recorded at orientation.  Thirdly,

13   there was a prerecording on most telephone calls saying that

14   the calls may be monitored and recorded.

15          The government also presents to the Court --

16          THE COURT:  I have no doubt that that's the law, but

17   the problem is we haven't established that's the case at the

18   place where she was incarcerated.

19          MR. DOWDEN:  Yes, your Honor.  With that foundation,

09:08 20   the government is prepared you present you with a number of

21   different items.

22          The first is the government is prepared to present you

23   with a financial responsibility statement that Ms. Robinson

24   signed when she was oriented into the Wyatt detention facility.

25   On that she signed the form which notes that she acknowledges

1    that detainee telephone calls would be monitored.  And she

2    notes, "I have read and have had read to me the above

3    notification on monitoring of detainee telephone calls.  I

4    understand that any telephone calls I make from the institution

5    telephones may be monitored and recorded."

6              The government offers that as Exhibit 1.

7              THE COURT:  Is there any objection to that?

8              MR. SMITH:  No, your Honor.

9              THE COURT:  All right, that's admitted.

09:09 10         (Exhibit 1 received into evidence.)

11             MR. DOWDEN:  Your Honor, similarly, the government

12   would offer Government Exhibit 2, which under the procedures at

13   Wyatt, in order to place a number which an inmate wants to call

14   from Wyatt, they're required to fill out a form giving the

15   relationship of that person and the telephone number in order

16   to have designated telephone numbers added to that.  At the

17   bottom of that certification, there's a statement that says,

18   "Acceptance of the PIN and use of detainee telephone will be

19   deemed consent to the conditions and restrictions placed upon

09:10 20  detainee telephone call, including call monitoring, recording

21   and call detail."  Ms. Robinson signed this document on 8/14/08

22   -- rather 10/15/08 adding individuals to her phone call list.

23   The government would offer that as Exhibit 2.

24             THE COURT:  Any objection?

25             MR. SMITH:  No, your Honor.

1          THE COURT:  Admitted.

2          (Exhibit 2 received into evidence.)

3          (Discussion off the record.)

4          MR. DOWDEN:  Next, your Honor, the government would

5    present evidence that Ms. Robinson was housed in the K pod at

6    the Wyatt detention facility, which is the facility that houses

7    all women.  The phones in that facility for outside telephone

8    calls are located in the day facility.  On each of those

9    telephones is a preprinted placard that says, "All calls are

09:14 10   monitored and recorded."

11          The government is prepared to present evidence in the

12    form of five or six photographs that show that placard on top

13    of each telephone.  The government would offer that as Exhibit

14    3.

15          THE COURT:  Any objection?

16          MR. SMITH:  No.  My copies didn't come out.  Can I

17    just see --

18          THE COURT:  Sure, sure, go ahead.

19          (Pause.)

09:15 20   MR. SMITH:  No objection, your Honor.

21          THE COURT:  Admitted.

22          (Exhibit 3 received into evidence.)

23          THE COURT:  Anything further?

24          MR. DOWDEN:  Your Honor, the other piece of evidence

25    the Court would like to hear, on many of the recorded telephone

1  calls, there is a prerecording on that telephone call which

2  says, "This call may be recorded."  While not on every call,

3  this was prerecorded on phone calls beginning as early as

4  August 23, 2008.

5        THE COURT:  Do you know whether it was given on the

6  phone calls that you want to play?

7        MR. DOWDEN:  Not all of those calls, but certainly the

8  recording was given in calls that predate the calls which we

9  would introduce in this case, your Honor.  On the calls that

09:18  10  she's had predating the ones we're going to introduce, there is

11  a statement that says, All calls are being recorded.

12        Also, we introduce several telephone calls in which

13  the defendant talks to her sister and acknowledges they're

14  recording this telephone call.

15        THE COURT:  If you want to play those, that's fine.

16        I don't see her sister's name on the telephone numbers

17  or at least incoming calls.

18        MR. DOWDEN:  Your Honor, the sister that's proffered

19  as a custodian is not who's on these telephone calls.  A

09:20  20  different sister is on these telephone calls.

21        THE COURT:  I don't see any sisters listed.

22        MR. DOWDEN:  Natasha Wilkinson, your Honor.

23        THE COURT:  Government Exhibit 2, I see Christian

24  Lewis, Linda Garcia, Tyrell Wilkinson, I see Linda Garcia.

25        (Pause.)

1          MR. DOWDEN:  Your Honor, I don't have that particular

2    form which goes directly to Ms. Wilkinson, but I would suggest,

3    your Honor, that the forms do suggest that all telephone calls

4    would be monitored.

5          THE COURT:  Oh, I understand that.  I was just

6    wondering.

7          Go ahead.  Now you're going to play the ones that warn

8    her that phone calls were recorded.  Would you identify each

9    one by date?

09:21 10          MR. DOWDEN:  Yes, your Honor.  I'll start with the

11   first one that occurred on August 23, 2008.

12          (Played recording.)

13          MR. DOWDEN:  Your Honor, that's the first tape.

14          THE COURT:  Thank you.

15          MR. SMITH:  Your Honor, just for our purposes, our

16   only objection, we've read the case, we understand what the law

17   is.  I just want to understand that we are not waiving any

18   rights should the government decide to use these in evidence

19   later on.

09:23 20          THE COURT:  Oh, that's -- you're not waiving anything.

21          MR. SMITH:  All right.

22          THE COURT:  With that do you concur that the

23   government can play these other phone calls that they wanted to

24   play in the first place?

25          MR. SMITH:  We have no follow-on objection, your

1    Honor.

2              THE COURT:  All right.  So you can go straight to --

3    I'm satisfied that you laid the foundation that was lacking

4    last time.  So if you want to go now where you left off the

5    other day, that's fine.

6              MR. DOWDEN:  Thank you, your Honor.

7              As the government argued last time we were here, the

8    government continues to have concerns that Ms. Robinson poses a

9    flight risk.  And one of the concerns here is the fact that the

09:24 10    victim gave her $280,000 in cash.  The government does have

11   concerns that that cash or proceeds from that cash are still

12   readily available to Ms. Robinson in the event that she decides

13   not to appear for purposes of further proceedings.

14             For that, the government proffers three conversations

15   which suggest that proceeds from that cash is still available

16   to Ms. Robinson.

17             The first is a telephone call between Ms. Robinson and

18   her sister that occurred on September 12, 2008.

19             THE COURT:  Now, what is the name of the sister?

09:24 20             MR. DOWDEN:  Natasha Wilkinson.

21             THE COURT:  Natasha Wilkinson.

22             MR. SMITH:  I'm sorry what, date again?

23             MR. DOWDEN:  September 12, 2008.

24             THE COURT:  You may play it.

25             (Pause.)

1           MR. DOWDEN:  Your Honor, I also note that many of

2    these telephone calls go on for about 15 to 18 minutes.  Rather

3    than bore the Court with conversations that are irrelevant to

4    the topic, I'd ask that we can proceed to those portions of the

5    conversation that directly deal with this issue.

6           THE COURT:  All right.

7           MR. SMITH:  No objection, your Honor.

8           THE COURT:  Okay.

9           (Played recording.)

09:27 10          MR. DOWDEN:  I'm going to move now to the relevant

11    portion.

12          THE COURT:  Okay.  Is there any way you can turn up

13    the volume?

14          MR. DOWDEN:  Yes, your Honor, I apologize.

15          (Played recording.)

16          MR. DOWDEN:  Your Honor, for that portion --

17          THE COURT:  Why don't you give me your interpretation

18    of what was said, because I got the idea that she was asking

19    the sister to do things that cost money, it would amount to

09:28 20   5,000, but as to what she said, I found it very difficult to --

21          MR. DOWDEN:  Your Honor, the defendant's sister said,

22    I had to go to another one, to which Ms. Robinson responded,

23    Another stack?  To which there is a further conversation which

24    Ms. Robinson says, Don't use it on one.

25          THE COURT:  Okay.  Let's go to the next one.

1          (Pause.)

2          MR. DOWDEN:  Your Honor, the second phone call occurs

3     on September 27, 2008.  And the phone call gets cut off at one

4     point and reissued with another call right after.

5          THE COURT:  And this is also Natasha?

6          MR. DOWDEN:  This is also Natasha.

7          THE COURT:  Thank you.

8          (Played recording.)

9          MR. DOWDEN:  Your Honor, that's where the telephone

09:38 10   terminates, and then I'll get the reinitiation.

11          THE COURT:  Okay, same day?

12          MR. DOWDEN:  Same day.

13          (Pause.)

14          THE COURT:  Before you do that, again, it was very

15     hard to understand.  Would you tell me what your take on that

16     is?

17          MR. DOWDEN:  Your Honor, there appears to be an effort

18     to do an accounting of the proceeds of what was purchased with

19     the proceeds from the victim.  And at one point it was said,

09:39 20   All you need to account for is $100,000.  And they said, Okay,

21     and started talking about things that had been purchased,

22     Rolexes and gold watches.

23          THE COURT:  Okay.  Go to the next part.

24          (Played recording.)

25          MR. DOWDEN:  Your Honor, the next call the government

1    would offer occurred on October the 6th.

2            THE COURT:  Thank you.

3            (Pause.)

4            MR. DOWDEN:  Your Honor, if we I may have (inaudible)

5    approach for a quick second.

6            THE COURT:  Sure, as long as it's only a quick second.

7            (Pause.)

8            (Played recording.)

9            MR. DOWDEN:  Your Honor, I'm going to proceed to later

09:47 10    in the phone call.

11            (Played recording.)

12            MR. DOWDEN:  Your Honor, the last phone call on this

13    topic the government would offer occurred on October the 12th.

14            THE COURT:  Okay.

15            MR. SMITH:  Is that the last one?

16            MR. DOWDEN:  On this topic, yes.

17            (Played recording.)

18            MR. DOWDEN:  Your Honor, we move to a later point in

19    the tape.

09:51 20            THE COURT:  Okay.

21            (Played recording.)

22            MR. DOWDEN:  Your Honor, that's the last tape we offer

23    on this point.

24            THE COURT:  Okay.

25            Do you have any other evidence?

1          MR. DOWDEN:  Your Honor, not at this time, no.

2          THE COURT:  Why don't I hear your argument, and then

3     I'll hear Mr. Smith and his take on these conversations and his

4     argument in support of the motion to reconsider.

5          MR. DOWDEN:  Your Honor, as we argued and continue to

6     argue throughout this case, the government has substantial

7     concerns about the availability of cash and Ms. Robinson's

8     intent to flee.

9          As the Court will recall, when she was initially

09:53 10   arrested, Ms. Robinson had passports, passport applications,

11    those have now been seized.  But the tapes we played, the

12    previous recording state quite clearly, I got to get out of

13    here, I need to leave, I need to leave, I need to get out of

14    here.

15         There's also some statements in the previous tapes

16    which talk about how she doesn't want to go before that judge.

17         So she has indicated language not to appear, and the

18    $280,000 is a substantial concern.

19         As the Court heard on these tapes there is

09:53 20   conversation about not only cash out there but things that need

21    to be secreted in a safe deposit box.  But misrepresentations

22    she's making:  Tell them this, tell them that.  The government

23    does not feel safe that she would appear at future proceedings

24    in this case.

25         Your Honor, to the extent there is an issue of

1    custodians offered, the government would address that as a

2    separate issue.  Right now we're focusing just on the

3    availability of cash and her ability to flee.

4            THE COURT:  No, I think you ought to address it now.

5    They're putting forth the other sister, Monique.

6            MR. DOWDEN:  Yes, your Honor.  The government has

7    concerns about Monique.  As Pretrial Services noted, she is a

8    younger sister; she does not appear to have any source of

9    employment.  If the Court would like to hear, we do have some

09:57 10   tapes that would suggest that she's previously been on welfare,

11   she's been unemployed.  There's also a statement by the

12   defendant that she's a pathological liar, things that would

13   suggest that she's not going to exert the requisite control

14   over Ms. Robinson in order to make sure that she will abide by

15   conditions of release.

16           THE COURT:  Do you have a tape where Ms. Robinson is

17   saying that Monique is a pathological liar?

18           MR. DOWDEN:  There's a discussion between Ms. Natasha

19   Wilkinson and Ms. Robinson where that is a discussion.

09:58 20          THE COURT:  Do you have it?  Can you play it?

21           MR. DOWDEN:  If the Court would like to hear it, your

22   Honor, yes, I do.

23           (Pause.)

24           (Played recording.)

25           MR. SMITH:  Judge, I'd like to respond to that if I

1    could.  I don't think that's really a consideration here.

2            As the Court is aware, my client does have a daughter.

3    I think you put this in context --

4            THE COURT:  You'll get a chance to talk.  I don't

5    think he finished his argument yet.  You're going to get a

6    chance to put all of that in context.

7            MR. SMITH:  Thank you.

8            MR. DOWDEN:  Thank you, your Honor.

9            So the government believes that the proffered

10:00 10    custodian, Monique Robinson, given her age, given the fact that

11    she does not appear to have a fantastic relationship with her

12    sister, they appear to have some acrimony between them, and the

13    fact of the matter is Ms. Robinson has been engaged in a

14    lifestyle of prostitution for the last couple of years, and her

15    sister at this point hasn't been able to talk her out of that.

16    So there is a concern here on behalf of the government that she

17    would not be a proper custodian in this case, given her own

18    inability to gain gainful employment, to secure an apartment on

19    her own.

10:01 20            As the Court is well aware, the proffered apartment in

21    this case has been obtained by a brother, Tyrone Wilkinson,

22    which the government has substantial concern about his presence

23    at the apartment as well.  To the extent the Court wishes to

24    hear more evidence about Mr. Wilkinson, we do have some

25    evidence to suggest that Ms. Robinson believes that he smokes

```
 1   weed regularly, that he's visited her at the prison smelling

 2   like weed, and so we do have some concerns about that as well,

 3   your Honor.

 4             With that, your Honor, the government rests.

 5             THE COURT:  Mr. Smith.

 6             MR. SMITH:  Yes, your Honor.

 7             I'm not surprised here in that when we came to the

 8   case the first time in August, the government alleged that my

 9   client had extorted to obtain 280,000, and nothing has changed

10   since that date.  They're saying the same thing today.

11             What they've offered is four or five tapes that are

12   open to a very subjective interpretation, depending on what you

13   hear in those tapes.  I heard a question on the September

14   27th --

15             THE COURT:  Well, who is -- when they are referring to

16   he is investigating, who are they talking about as the

17   investigator?  Do you know?

18             MR. SMITH:  I have utilized an investigator in this

19   case, your Honor.

20             THE COURT:  So it's your investigator that Natasha is

21   talking about asking all these questions?

22             MR. SMITH:  I can't offer the answer because I haven't

23   sat down with my client and Natasha to verify.  We've utilized

24   an investigator in this case.

25             I also -- I heard (inaudible) the answer was no from
```

1    my client in one of the tapes, your Honor.

2        So I'm not sure you could draw all of the inferences

3    the government would want you to draw.  But the truth of the

4    matter is nothing has changed.  When we were here for the

5    detention hearing, they alleged $280,000 was missing.  We went

6    through a very lengthy detention hearing, very late into the

7    evening.  We proffered my client's brother as a potential

8    custodian; the Court had some concerns.  After all the

9    evidence, the examination, the cross-examination, the Court

10:07 10   found that absent a third-party custodian, someone needed to be

11   with the defendant at all times.  We've proffered now Monique

12   Wilkinson as that party.

13       Now, Monique Wilkinson is 26 years old.  She's not a

14   child.  She's never been arrested, she's never been in trouble

15   with the law, you can ask any questions you would like.

16       I think the section you heard of that tape they're

17   talking about my client's daughter.  They're referencing her

18   daughter, Heaven, I believe.  And I think --

19       THE COURT:  Do you deny that your client said that

10:08 20   Monique was a pathological liar?

21       MR. SMITH:  I'm trying to put those comments in

22   context.

23       THE COURT:  Okay, I just want to make sure.

24       MR. SMITH:  I'm not denying the statement was made.  I

25   wouldn't be surprised if many people that work in various jobs

1    have said the same thing about their siblings when they're in

2    situations of duress.  So I don't find that a ridiculous

3    statement.

4          The truth of the matter is, Monique is here, she can

5    answer any questions the Court would want to present to her.

6    She's never been in trouble, she's not been arrested, she's not

7    been convicted.  She's ready and willing to step in as the

8    third-party custodian in that apartment in Dorchester.  I think

9    the concerns about Monique Wilkinson are her ability to act as

10:09 10   a third-party custodian.  I presume we'd be proposing my client

11   wear a bracelet and confined to the apartment, which is a four-

12   bedroom apartment, a triple decker in Dorchester.

13         If, for whatever reason, we have other family members

14   that are willing to step forward and act as custodians.  We

15   have an aunt, Patricia Wilkinson, that lives in a different

16   house that we would be willing to proffer.  I don't think we

17   need to go there, but if that's something you want to pursue,

18   we'd be willing to make her available to Pretrial Services.

19         THE COURT:  Are you saying these people are here?  Are

10:10 20   they here in the courtroom?

21         MR. SMITH:  You know what, Judge, when we entered the

22   courtroom, they were outside.  They were in the courtroom.

23         THE COURT:  Fine.

24         MR. SMITH:  I may have missed --

25         THE COURT:  I just didn't see them here.

1          MR. SMITH:  We can bring them back in, Judge.  They

2     were here.

3          THE COURT:  All right, continue.

4          MR. SMITH:  Patricia Wilkinson is my client's aunt.

5     She has her own house in Roxbury.  She is ready, willing, and

6     able, if Monique Wilkinson were not acceptable to the Court, to

7     step in as a third-party once she were interviewed and cleared

8     by Pretrial Services.  I believe Pretrial Services had no

9     problem.

10:10 10          She's employed.  She works a 9:00 to 5:00 shift, her

11    husband works from 4:00 to midnight.  There would be an hour or

12    two during the day there would be nobody there.  We could have

13    arrangements to have Monique Wilkinson step in if that is what

14    the Court wanted.

15         With that being said, your Honor, nothing has changed

16    as far as the government's perspective.  They alleged that

17    there is $280,000 in my client's control, custody back in

18    August, they're still alleging the same thing.  It sounds on

19    these tapes there was one reference to the stack --

10:11 20         THE COURT:  The fact that that has not changed is one

21    of the problems, and her ability to access that amount of cash

22    at least was one of the reasons that I ordered her detained.

23    So the fact that you say nothing has changed doesn't

24    necessarily work in your favor.

25         MR. SMITH:  Well, no -- well, let me concede then,

1    I'll agree -- if that's the Court's position -- but I don't
2    think these tapes add anything, and after hearing the evidence,
3    the Court considered a third-party custodian as being
4    appropriate.  So we have that third-party custodian to be with
5    my client all the time, her sister.  And I don't know what else
6    we could offer if that's what the Court is interested in.
7              THE COURT:  Okay.
8              MR. SMITH:  Also, Judge, the other difference is that
9    one thing that has changed is when we were at the detention
10:12 10   hearing, there was a warrant outstanding that has been vacated,
11   all of the cases were dismissed.
12             THE COURT:  That was something I was concerned about;
13   you did take care of that.
14             MR. SMITH:  That was taken care of.  My client has no
15   record of conviction, and I think she would be amenable and
16   would be a good candidate for release to a third-party
17   custodian.
18             THE COURT:  Thank you.
19             MR. DOWDEN:  Your Honor, just one additional point if
10:12 20   I may.
21             THE COURT:  Yes.
22             MR. DOWDEN:  One other additional change is the
23   defendant has been indicted on different charges.  Previously
24   she was indicted on a charge that carried a two-year statutory
25   maximum.  She's now been charged with additional charges of

1    wire fraud, which I believe is a 20-year maximum.  So the

2    incentive to flee, your Honor, has increased.

3            MR. SMITH:  Just to address that issue.  When we were

4    here, the Court discussed the possibility of a Hobbs Act

5    indictment.  That didn't happen.  Either the grand jury didn't

6    find sufficient evidence or the government realized that they

7    didn't have the facts.

8            THE COURT:  Okay.  All right.

9            I will not release her in the custody of Monique.

10:14 10  When I said there has to be a third-party custodian who would

11   be with her at all times, it wasn't *ipso facto* you come up with

12   someone who could stay with her at all times and she would be

13   released.  It has to be a third-party custodian who is able to

14   exercise some control over the defendant and whose authority

15   the defendant would accept.  And after hearing that

16   conversation, I have absolutely no confidence at all that

17   Michelle Robinson would be amenable to obeying and having

18   Monique supervise her.  The relationship between the two sounds

19   to me pretty explosive.  To call Monique a pathological liar,

10:15 20  in whatever context you said, if nothing else, it indicates a

21   relationship that is not one that's conducive to appropriate

22   third-party custodianship because it doesn't sound like

23   Michelle has any respect for Monique, in fact, has just the

24   opposite.  So I would not release her third-party

25   custodianship.

1           Frankly, there's a lot of talk on those tapes,

2     Ms. Robinson talking to her sister, with respect to tell him

3     this, tell him that, tell him this, that the plain inference is

4     that she's telling her sister to tell things that are not true.

5     I just see this as an additional con that Michelle Robinson is

6     continuing to perpetrate as this case unfolds, so I will not

7     release her in the custody of Monique.

8           I will allow Pretrial Services to interview the aunt

9     and the aunt's husband and give me a report on that, and I

10:16 10     would consider that.  But it's -- if she's going to have a

11     third-party custodian, it's got to be someone she respects and

12     someone with whom she's willing to take commands and obey

13     instructions and basically be straight with.  Monique is not

14     that person.

15           So the motion to reconsider, to the extent that you're

16     asking me to release her in the custody of Monique, is denied.

17     I certainly will, as I say, allow Pretrial Services to

18     interview the aunt and the aunt's husband, and I will cross

19     that bridge when I get to it.  But on the present record, the

10:17 20     motion to reconsider, to the extent it seeks to have me release

21     her in Monique's custody, is denied.

22           That concludes the proceedings in the case, and

23     Mr. Gray, you'll take care of those exhibits.

24           THE CLERK:  All rise.

25           (Court adjourned.)

- - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript
of the record of proceedings in the above-entitled matter to
the best of my skill and ability.

/s/Debra M. Joyce                    May 13, 2019
Debra M. Joyce, RMR, CRR, FCRR       Date
Official Court Reporter